IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES E. STEVENS, as trustee of the bankruptcy estate of Kye E. Gaffey,<br><br>    Plaintiff,<br><br>    v.<br><br>ILLINOIS DEPARTMENT OF JUVENILE JUSTICE, et al.,<br><br>    Defendants. | No. 15-cv-06904<br><br>Judge Andrea R. Wood |

## MEMORANDUM OPINION AND ORDER

Plaintiff James E. Stevens ("Plaintiff") has brought this action in his role as trustee for the bankruptcy estate of Kye Gaffey, claiming that Gaffey was fired from his position as superintendent of Illinois School District 428 ("District 428") in violation of his constitutional due process rights and the terms of his employment contract. Plaintiff asserts federal due process claims against Defendants Arthur Bishop, District 428's School Board ("Board"), and the named individual Board members (Counts I and II), as well as breach of contract claims against the Board only (Counts IV and V).[1] Now before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 57, 60.) For the reasons stated below, Plaintiff's motion is denied and Defendants' motion is granted.

### BACKGROUND

Except as otherwise noted, the following facts are undisputed.

Gaffey was hired as the superintendent for District 428 on or about August 21, 2011. (Defs.' Resp. to Pl.'s Statement of Undisputed Facts ("DRSOF") ¶ 12, Dkt. No. 63.) District 428

---

[1] On December 1, 2016, this Court dismissed Count III, a due process claim against Defendant Illinois Department of Juvenile Justice. (*See* Dkt. No. 34.)

is a statewide school district that administers educational programs for incarcerated juveniles in Illinois. (Pl.'s Resp. to Defs.' Statement of Undisputed Facts ("PRSOF") ¶¶ 2–3, Dkt. No. 65.) Bishop served as Director of the Department of Juvenile Justice ("Department") and President of the Board throughout the time period at issue. (DRSOF ¶ 5.) He was also involved in hiring Gaffey and served as his direct supervisor. (DRSOF ¶ 13.) Fellow Defendants James Gunnell, Anthony Grady, Donald Smoot, Carl Ellis, and Tresa Dunbar were members of the Board in August 2013. (DRSOF ¶ 5.) When the complaint in this lawsuit was filed in August 2015, Dunbar was still a member of the Board (PRSOF ¶ 9), Defendant Candice Jones was Director of the Department and a member of the Board (PRSOF ¶ 8), and Defendants Heather Dalmage, David A. Green, John P. Griffin, Candice Smith, and Jennifer Vidis were members of the Board (PRSOF ¶ 9).

The Board met approximately ten times per year. (DRSOF ¶ 26.) Delores McKinney, Bishop's secretary, prepared minutes and agendas for those meetings and audio recorded the open portions. (DRSOF ¶¶ 28–29.) Closed portions of the meetings were recorded by the Board's attorney. (DRSOF ¶ 30.)

Gaffey participated in two interviews before being hired as superintendent. (PRSOF ¶ 13.) There was no discussion during either interview regarding the duration of Gaffey's employment, whether he could be fired at will, his salary, or the existence of grievance or disciplinary procedures. (PRSOF ¶¶ 14–15.) But around the time he was hired, Gaffey received and signed a one-page document stating his date of employment and describing his position. (DRSOF ¶ 15.) Gaffey's terms of employment did not include performance-based requirements. (DRSOF ¶ 16.)

On August 15, 2013, Gaffey and his then-wife were arrested for trespass and criminal damage to property. (PRSOF ¶ 21.) The charges were dropped after Gaffey entered a pretrial diversion program and completed community service. (PRSOF ¶ 23.) Bishop and the Department first heard about Gaffey's arrest as a result of a media inquiry on August 20, 2013. (PRSOF ¶ 35.) Gaffey then emailed Bishop and others about the arrest that evening. (PRSOF ¶ 36.) The parties dispute whether Bishop understood Gaffey's email to be a resignation. (PRSOF ¶ 41.) But there is no dispute that Bishop subsequently sent Gaffey an email directing him to come to Bishop's office the following day and to bring his state equipment. (PRSOF ¶ 42.) After receiving the email, Gaffey called Bishop and agreed to go to the Department's Kewanee, Illinois office the following day to turn in his equipment. (PRSOF ¶¶ 43, 50.) The parties dispute whether Gaffey indicated during that conversation that he would resign, but they agree Gaffey assumed he was being fired. (PRSOF ¶¶ 45, 49.)

After their conversation, Bishop expected Gaffey to bring a letter of resignation to the meeting the next day. (DRSOF ¶ 24.) But Gaffey did not attend the meeting at all. (PRSOF ¶ 62.) In a phone call, Gaffey told Ron Smith, with whom Gaffey was expected to meet, that he was not coming to the meeting but instead was going out of town, which was a lie. (PRSOF ¶ 64.) Smith told Gaffey to call Bishop, but Gaffey refused. (PRSOF ¶ 64.) In the end, Gaffey never returned to work but he also did not submit a written resignation letter. (PRSOF ¶¶ 68, 70.)

On August 21, 2013, the Board held a teleconference to discuss Gaffey's employment status and the need for an emergency Board meeting. (DRSOF ¶ 32; PRSOF ¶ 71.) The Board's emergency meeting was held on August 26, 2013; there, Board members discussed Gaffey's employment, in part in closed sessions. (DRSOF ¶¶ 50, 55.) Bishop, Gunnell, Ellis, Smoot, and

Grady were all in attendance. (PRSOF ¶ 72.) After the Board decided in a closed-door session to fire Gaffey for abandoning his position, the Board voted in an open session to terminate Gaffey and appoint Rick Gravatt as the acting superintendent of District 428. (PRSOF ¶¶ 77, 78.) Gaffey was not notified of this meeting and he did not learn of his termination until approximately one month later. (DRSOF ¶¶ 69, 75.)

There are two federal and two state law claims remaining in this lawsuit. Counts I and II consist of claims under 42 U.S.C. § 1983 for violations of Gaffey's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and are asserted against Bishop, the Board, and the individual Board members. Counts IV and V consist of state law claims for breach of contract against the Board—first, with respect to its obligations for the 2013–2014 school year, and second, with respect to its obligations for the 2014–2015 school year. In their cross-motions for summary judgment, the parties primarily dispute whether the Board may invoke sovereign immunity as a defense to the due process claims and whether Gaffey had a protectable property interest in his position as superintendent for purposes of those claims. Neither side seeks summary judgment with respect to the breach of contract counts.

## DISCUSSION

Under Federal Rule of Civil Procedure 56, "a party may move for summary judgment, identifying each claim or defense—or part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. To make such a showing, the movant must identify relevant portions of the evidentiary record—including the pleadings, depositions, affidavits, and answers to interrogatories—demonstrating the lack of any genuine dispute of material fact. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing the motion then must respond by setting forth specific facts showing that there is a genuine factual issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a genuine issue of fact for trial, the Court must view all evidence in the light most favorable to the nonmovant and draw all reasonable inferences in favor of the nonmovant. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). The same standard applies when there are cross-motions for summary judgment. *Calumet River Fleeting, Inc. v. Int'l Union of Operating Eng'rs, Local 150, AFL-CIO*, 824 F.3d 645, 647–48 (7th Cir. 2016). And each summary judgment motion must be evaluated independently—the denial of one does not mean the other must be granted. *Dominguez v. Quigley's Irish Pub, Inc.,* 790 F. Supp. 2d 803, 810 (N.D. Ill. 2011).

### I. Eleventh Amendment Immunity

Defendants contend that Plaintiff's suit against the Board is barred by the Eleventh Amendment to the United States Constitution, which grants states immunity from private suits brought in federal court without their consent. *See Nuñez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016). That immunity extends to state agencies and state officials sued in their official capacities. *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). But while the bar against suit in federal courts protects state agencies, it does not shield counties, municipal corporations, or political subdivisions. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Whether the Board is immune therefore depends on whether the Court should regard it as an arm of the state for Eleventh Amendment purposes. States and their agencies also have a related but distinct defense to § 1983 claims, since they are not suable "persons" within the meaning of that statute. *Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir.

2012); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) (holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983").

To determine whether an entity is an arm of the state, courts consider the entity's financial autonomy from the state and the "general legal status" of the entity. *Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417, 420 (7th Cir. 2008) (citing *Kashani v. Purdue Univ.*, 813 F.2d 843, 845–47 (7th Cir. 1987)). The most critical factor in the analysis, however, is "the extent of the entity's financial autonomy from the state." *Kashani*, 813 F.2d at 847. That inquiry, in turn, requires consideration of five factors: "(1) the extent of state funding; (2) the state's oversight and control of the entity's fiscal affairs; (3) the entity's ability to raise funds; (4) whether the entity is subject to state taxation; and (5) whether a judgment against the entity would result in an increase in its appropriations." *Peirick v. IUPUI Athletics Dep't*, 510 F.3d 681, 696 (7th Cir. 2007).

Local school districts generally are not considered arms of the state. *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 927 (7th Cir. 2012). But unlike a typical local school district in Illinois, District 428 receives no county or municipal funding and no property tax revenue. (PRSOF ¶ 3). Nor is District 428 entitled to levy taxes or issue bonds. *See* 105 ILCS 5/17-2.11 (granting school boards the power to levy taxes, borrow money, and issue bonds) and 105 ILCS 5/13-45 (declaring 105 ILCS 5/17-2.11 inapplicable to District 428). The Board, which governs and operates in service to District 428, therefore lacks important means by which to raise funds that are generally available to other school districts. The third factor—the entity's ability to raise funds—thus weighs against a finding of the Board's autonomy from the state.

The first factor (the extent of state funding) and the second factor (the state's oversight and control of fiscal affairs) also suggest District 428's financial dependence on the state. While

6

District 428 does receive some funding from outside grants, the federal government funds approximately 80% of its budget, with the state allocating the remainder. (Defs.' Statement of Undisputed Facts ("DSOF") Ex. C at 129:12–18, 130:2–9, Dkt. No. 59-3.) Regardless of the source, all the funds District 428 receives must first be deposited with the Department of Corrections Reimbursement and Education Fund in the state treasury before those funds may be used, "subject to appropriation, to pay the expenses of the school and school district." 105 ILCS 5/13-44.4. Moreover, District 428's budget must be "submitted to the Department of Corrections and the State Board of Education for incorporation." *Id*.; *see also* 105 ILCS 5/13-43.20 (providing for recommending to the State Board of Education the necessary funds for operating the District's programs). The statutory funding scheme therefore leaves District 428, and thus the Board, dependent on the state in a way other school boards are not: the state must approve a budget and release funding to District 428 for it to get ***any*** funding.

Most crucially, the statutory scheme suggests that the state will be liable for any judgment against the Board. Any budget for District 428 is supposed to include coverage for "all necessary expenses and liabilities" that District 428 may incur. 105 ILCS 5/13-44.4. All funding for District 428 must ultimately be provided by the state treasury. *Id*. Any judgment or liability incurred by the Board would necessarily be paid by the state—District 428, and thus its governing Board, cannot levy taxes or issue bonds to raise funds, and any outside funds must be routed through the state treasury subject to state appropriation. Moreover, the types of outside grants mentioned by Gaffey in his deposition seem to be geared toward starting or funding specific educational programs. (*See* DSOF Ex. C at 129:12–18.) It would be unrealistic to believe that the Board could fundraise on District 428's behalf for the purpose of covering a legal judgment; and even if it could, the funds still would need to be appropriated by the state treasury.

7

In sum, the Board depends on the state for financial support; and since that support is allocated by the state treasury, any judgment against the Board would necessarily impact the state treasury. The Court thus finds that the Board lacks financial autonomy from the state.[2]

The Board's general legal status also suggests a lack of operational independence from the state. As the parties agree, relevant factors for determining an entity's legal status include whether the governing Board members are independently selected, the district's ability to exercise its powers independently, and whether the entity serves the entirety of the state or only a portion of it. *Peirick*, 510 F.3d at 696–97. The Board's composition weighs against finding an independent legal status. The Governor of Illinois appoints one member of the Board, the Director of the Department, directly. 105 ILCS 5/13-41. The Director, in turn, appoints two members, and the State Board of Education appoints another four members. *Id*. Plaintiff does not dispute the Board's composition but instead contends that this factor is not dispositive. The problem for Plaintiff is that the other factors also suggest that the Board's "general legal status" is not an independent one. Plaintiff concedes that District 428 operates statewide. In addition, the governing statute defines District 428 as one created "within the Department" and compels the Board to seek advice from the Department and the State Board of Education. 105 ILCS 5/13-40.

Overall, there is a noted absence of operational independence. As the Board is not financially autonomous or operationally independent of the state, the Court finds that the Board is not a "person" subject to liability under § 1983 and, in any case, that sovereign immunity would preclude any suit against it for damages. The Court therefore grants summary judgment in the Board's favor as to Count II. And because sovereign immunity "prohibits a federal court from adjudicating state law claims against the state and its agencies where, as here, it does not

---

[2] Neither party discusses the fourth factor: whether the Board is subject to taxation. There is no evidence in the record on this point.

8

consent," *Offor v. Ill. Dept of Human Servs.*, No. 11 C 7296, 2013 WL 170000, at *4 (N.D. Ill. Jan. 16, 2013), the Court also dismisses the breach of contract claims in Counts IV and V without prejudice to Plaintiff pursuing whatever remedies may be available to him in state court. *See* 745 ILCS 5/1; 705 ILCS 505/8.

## II. Personal Involvement of Individual Board Members

In Count II, Plaintiff also asserts § 1983 claims for due process violations against various individual Board members. Individual liability under § 1983 "requires personal involvement in the alleged constitutional deprivation." *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). Plaintiff must therefore demonstrate that each individual Board member directly participated in or caused the claimed deprivation of his due process rights. *See Minix v. Canarecci*, 597 F.3d 824, 833–34 (7th Cir. 2010).

Five of the individual Defendants (Dalmage, Green, Griffin, Smith, and Vidis) were not members of the Board when Gaffey was terminated in August 2013. Additionally, Jones served as Director of the Department, and thus a member of the Board, as of August 2015, but she was not a member in August 2013. Plaintiff asserts that the claimed violations of Gaffey's due process rights were still ongoing when the complaint was filed, making these individuals liable under § 1983. But the relevant question is whether these individuals caused or participated in the alleged deprivation—the termination of Gaffey's employment with District 428. As none of these individuals served on the Board at the time the Board ended Gaffey's employment, they could not have participated in causing that deprivation. The Court therefore grants summary judgment on Count II with respect to Defendants Dalmage, Green, Griffin, Jones, Smith, and Vidis. In addition, although Defendant Dunbar was a member of the Board in August 2013, she did not attend the August 26, 2013 meeting at which Gaffey's employment was terminated or

9

otherwise vote or act to terminate Gaffey's employment. Since Plaintiff does not present any evidence that Dunbar participated in the termination of Gaffey's employment, the Court also grants summary judgment as to Count II with respect to Dunbar.

### III. Existence of a Protected Property Interest

That leaves the individual Defendants who were members of the Board at the time of Gaffey's termination in August 2013 (other than Dunbar): Bishop, Gunnell, Grady, Smoot, and Ellis. To prove the procedural due process claim against these individual Defendants, Plaintiff must show "(1) that [Gaffey] had a constitutionally protected property interest, (2) that [Gaffey] suffered a loss of that interest amounting to a deprivation, and (3) that the deprivation occurred without due process of law." *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). Defendants contend that Plaintiff falters at the first element.

Protected property interests "are not created by the Constitution." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Rather, they "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law." *Id*. A protected property interest in employment may arise from statutes, regulations, or contracts. *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996). Since Gaffey was employed in Illinois, that state's law determines whether he had a property interest in his employment. *Moss*, 473 F.3d at 700. Under Illinois law, individuals have a property interest in their employment only where they can demonstrate a "legitimate expectation of continued employment based on a legitimate claim of entitlement." *Id.* "To show a legitimate expectation of continued employment, a plaintiff must show a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge him." *Krecek v. Bd. of Police Comm'rs of La Grange Park*, 646 N.E. 2d 1314, 1318–19 (Ill. 1993). Otherwise,

employment contracts for indefinite periods are presumed to be terminable at-will. *Barr v. Jelso-Burnett Co.*, 478 N.E. 2d 1354, 1356 (Ill. 1985).

### A. Application of Section 10-23.8 to District 428

Plaintiff bases his claim that Gaffey had a protected property interest in his employment as District 428 superintendent on the existence of an implied contract based on the requirements of Section 10-23.8 of the Illinois School Code ("School Code"). Plaintiff appears to claim an implied employment contract, rather than an express contract, because the written documentation of Gaffey's employment terms consists of a one-page "personnel/position action" form signed by Gaffey and Bishop. (*See* Compl., Ex. A, Dkt. No. 1-1.) The document indicates that, beginning August 16, 2011, Gaffey held the "exempt" position of "senior public service administrator" with a monthly salary of $9,187. (*See id.*; DRSOF ¶ 15.) This one-page form document does not include any agreement regarding the term of Gaffey's employment or the circumstances under which he could be terminated. Nonetheless, Plaintiff claims that once employed as a superintendent, Illinois statutory law provided that Gaffey would remain employed on a year-to-year contract basis unless provided notice of the Board's intent not to renew his contract by April 1 of the contract year.

Plaintiff's position is based on the provision of Section 10-23.8 stating that "school districts may only employ a superintendent or, if authorized by law, a chief executive officer under either a contract for a period not exceeding one year or a performance-based contract for a period not exceeding 5 years." 105 ILCS 5/10-23.8. In addition, Section 10-21.4 of the School Code provides that "[n]otice of intent not to renew a contract [for employment of a superintendent] must be given in writing stating the specific reason therefor by April 1 of the contract year unless the contract specifically provides otherwise. Failure to do so will

11

automatically extend the contract for an additional year." 105 ILCS 10-21.4. Plaintiff urges this Court to find that the one-page personnel/position action form, combined with the requirements of Illinois law as stated in Sections 10-23.8 and 10-21.4, provide a sufficient basis to conclude that Gaffey and the Board had an agreement for Gaffey to be employed on a year-to-year basis unless he received the Board's notice of intent not to renew his contract by April 1 of the contract year. For this reason, Plaintiff claims that Gaffey had a protected property interest in his continued employment as District 428 superintendent.

Defendants offer three reasons why Plaintiff should not be permitted to rely on Section 10-23.8 as providing Gaffey a protected property interest in his continued employment as superintendent. First, Defendants contend that Section 10-23.8 simply does not apply to District 428 superintendents. Plaintiff suggests that the Court should reject this argument out of hand because it already determined that the relevant provisions in Article 10 do not conflict with Article 13 when it denied Defendants' motion to dismiss the federal due process claim under Federal Rule of Civil Procedure 12(b)(6). (*See* Mem. Op. and Order at 7–8 (Dec. 1, 2016), Dkt. No. 34.) That finding, according to Plaintiff, is the law of the case and should not be revisited. But in their Rule 12(b)(6) motion, Defendants raised an argument based on a purported conflict between the requirements of Section 10-23.8 and **Section 13-43.6**, the latter of which describes the duties of superintendents for District 428. The Court rejected that argument and denied the motion to dismiss. Now, in their summary judgment motion pursuant to Rule 56, Defendants raise a related but arguably different argument. Accordingly, the Court does not view Defendant's current argument as foreclosed by its prior ruling.

The Court now turns to the merits of Defendants' present argument. Article 10 of the School Code governs local school districts (and their superintendents) generally, while Article 13

12

governs District 428 specifically. The extent to which Article 10 applies to District 428 is set forth in Section 13-45. 105 ILCS 5/13-45. That provision lists the specific Articles and Sections of the School Code that "shall ***not*** apply" to District 428. *See id.* (emphasis added). Those inapplicable provisions include "those Sections of Article 10 in conflict with any provisions of Sections 13-40 through 13-45." *Id.* The plain language of Section 13-45 thus leaves little doubt that some portions of Article 10 apply to District 428. Otherwise, there would be no reason for Section 13-45 specifically to exclude only those Sections of Article 10 "in conflict" with the listed Sections of Article 13. This language stands in contrast to the delineation of several other Articles of the School Code as inapplicable to District 428 in their entirety. Thus, Section 13-45 can only be read to provide, first, that there are sections of Article 10 that do not conflict with Sections 13-40 through 13-45, and second, those Sections apply to District 428.

Defendants claim that Section 10-23.8 cannot be one of those Sections that applies to District 428 because the language regarding contracts for superintendents found in Section 10-23.8 is not found anywhere in Article 13. Defendants posit that, "[i]f the legislature intended District [428] superintendents to be under contract, it would have stated so in Article 13." (Defs. Mem. at 8, Dkt. No. 58.) But Section 10-23.8 does not indicate that it is limited to any particular subset of Illinois school district superintendents; nor does it purport to exclude any superintendents from its requirements. More importantly, nothing about the contract requirement in Section 10-23.8 conflicts with any provisions of Section 13-40 through 13-45—those provisions of Article 13 say nothing one way or the other about whether the person hired as superintendent of District 428 must have a contract and, if so, whether that contract is limited to a term not exceeding one year. As this Court observed in its motion to dismiss ruling, Defendants offer no authority for their presumption that Sections of Article 10 and Article 13 should be

13

construed as "in conflict" where one is silent and the other speaks. To the contrary, the plain language and structure of Section 13-45 make clear that Article 13 was not intended to cover all of the same ground as Article 10, and that where Article 13 does not provide otherwise, the requirements of Article 10 govern District 428.

Defendants ask the Court to compare Section 10-21.4 with Section 13-43.6. They point out that the entirety of Section 13-43.6 is taken "word for word" from the first and second paragraphs of Section 10-21.4, and they suggest that any language not so incorporated should not be applied to District 428 superintendents. (Defs. Mem. at 8.) This would include the notice of non-renewal language in the final paragraph of Section 10-21.4. But this Court has already considered whether Section 10-21.4 conflicts with Section 13-43.6 in its motion to dismiss ruling and determined that it does not.

Next, Defendants argue that even if Section 10-23.8 did apply to Gaffey's position, it did not alter his status as an at-will employee. That is because Section 10-23.8 does not contain any language limiting the Board's ability to terminate a superintendent but does contain language limiting employment of superintendents "to a period not exceeding one year." Under Illinois law, "employment relationships without a fixed duration are presumed to be terminable at the will of either party." *Schwarz v. Loyola Univ. Med. Ctr.*, 659 F. Supp. 2d 988, 993 (N.D. Ill. 2009). This is true even for a written contract, unless the document contains "clear contractual language" showing that the parties agreed to a specified duration. *Id.* Inclusion of language establishing an employment relationship "'not to exceed' a certain period suggests an indefinite term of employment rather than a definite one." *Id.* (citing *Foiles v. N. Green Unit Dist.* No. 3, 633 N.E.2d 24 (Ill. App. Ct. 1994)). An indefinite term, in turn, suggests an at-will employment relationship. *Foiles,* 633 N.E.2d. at 26. Based on these principles of employment law, according

14

to Defendants, even under Section 10-23.8, Gaffey was an at-will employee with no protected property interest in his continued employment.

In *Schwarz*, however, the "not to exceed" language was included in the contract itself, whereas here, Section 10-23.8 uses that language to set a maximum term for non-performance-based contracts but does not necessarily preclude a school district from including a definite term in the superintendent's contract, so long as it does not exceed one year. Moreover, Defendants' reading of Section 10-23.8 as making Gaffey an at-will employee ignores the language of Section 10-21.4, which establishes that school boards ***must*** provide notice of their intent not to renew a contract in writing by April 1 of the contract year or else the contract is automatically extended for an additional year. Because that automatic extension is not subject to the "not exceeding" language present in Section 10-23.8 or any other qualification, it follows that the automatic extension is for a definite one-year period. Here, it is undisputed that Gaffey was hired in August 2011 and fired in August 2013. (DRSOF ¶¶ 12, 50, 64.) Nor do Defendants claim that they took any action affecting Gaffey's employment status prior to his August 2013 termination. Thus, under Section 10-21.4, Gaffey's employment term was fixed for a definite one-year period as of April 2012, and that term was renewed in April 2013 and in effect at the time of his firing. Because of that fixed term, Gaffey's employment cannot be deemed at will. *See, e.g.*, *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 317 (Ill. 1987) ("Nearly all courts agree on the general rule, that an employment relationship without a fixed duration is terminable at will by either party."); *Spear v. Bd. of Educ. of N. Shore Sch. Dist. No. 112*, 683 N.E.2d 218, 221 (Ill. App. Ct. 1997) ("Under Illinois law, employment which is not for a fixed term is presumed to be at will . . . .").

Lastly, Defendants claim that any interest Gaffey had in his continued employment as superintendent lapsed long before the alleged deprivation of that interest when he was terminated in August 2013. But, as previously explained in the Court's denial of Defendants' motion to dismiss, this argument ignores the fact that Section 10-21.4 operated automatically to extend Gaffey's contract for an additional year if he did not receive written notice of the Board's intent not to renew his employment by April 1, 2013, which he did not.

In sum, the Court concludes that Plaintiff has established that Gaffey had a protected property interest in his continued employment as superintendent of District 428 stemming from Illinois statutory law. Summary judgment cannot be granted in the remaining Defendants' favor on that basis.

## IV. Qualified Immunity

Defendants contend that even if Gaffey was deprived of a protected property interest in his employment, they are entitled to qualified immunity from suit because their conduct in terminating Gaffey did not violate his clearly established due process rights. Qualified immunity protects public officials from damages liability unless the evidence shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks omitted). The Supreme Court has repeatedly admonished courts against "defin[ing] clearly established law at a high level of generality." *Id.* (internal quotation marks omitted). Rather, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Id.* (internal quotation marks omitted). Thus, the inquiry "must be undertaken in light of the specific context of the case,

16

not as a broad general proposition." *Id.* (internal quotation marks omitted). "Existing caselaw must dictate the resolution of the parties' dispute, so while a case directly on point isn't required, precedent must have placed the constitutional question beyond debate." *Campbell v. Kalas*, 936 F.3d 536, 545 (7th Cir. 2019).

Plaintiff contends that Defendants' conduct violated Gaffey's clearly established right not to be deprived of his protected interest in employment without the procedural protections set forth by the Supreme Court in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). Specifically, *Loudermill* held that under the Due Process Clause, there must be "some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* at 542 (internal quotation marks omitted). That "pretermination 'hearing,' though necessary, need not be elaborate [and] the formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id.* at 545 (internal quotation marks omitted). However, the required hearing need only "be an initial check against mistaken decisions" and its "essential requirements" are "notice and an opportunity to respond." *Id.* at 545–46. The Seventh Circuit has elaborated that the employee must, at minimum, receive: "(1) oral or written notice of the charges, (2) an explanation of the employer's evidence, and (3) an opportunity to tell his side of the story." *Staples v. City of Milwaukee*, 142 F.3d 383, 385 (7th Cir. 1998).

According to Plaintiff, because Gaffey received no *Loudermill* hearing whatsoever prior to his termination, there is at least a material dispute of fact as to whether Defendants' conduct violated his clearly established due process rights. The Court finds Plaintiff's argument against qualified immunity to be flawed, however, as it frames "clearly established" law at too high a

17

level of generality. In essence, he argues that *Loudermill* entitled Gaffey to a pre-termination hearing and because the essential elements of *Loudermill* are absent from this case, Defendants are not entitled to qualified immunity. However, when viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude that the unlawfulness of Defendants' conduct is beyond debate.

In the first place, it is at least contestable whether Gaffey was, in fact, denied oral or written notice of the charges against him, an explanation of the evidence against him, and an opportunity to tell his side of the story. Indeed, it is undisputed that prior to Gaffey's termination, Gaffey and Bishop communicated about the arrest precipitating Gaffey's termination by email and by telephone. And the parties agree that during the phone call, there were at least discussions of Gaffey resigning. (*See* PRSOF ¶¶ 43–45.) Certainly, Gaffey believed that he faced the prospect of losing his job. (PRSOF ¶¶ 47–49.) Following the phone call, Bishop asked Gaffey to go to the Department's Kewanee office the next day to turn in his equipment.

Defendants contend that Gaffey's pre-termination conversations with Bishop, while informal, were sufficient for purposes of *Loudermill*. In response, Plaintiff denies that those informal discussions satisfied *Loudermill*'s essential requirements, particularly because there were no post-termination procedures available to Gaffey. Plaintiff is correct that *Loudermill* "rested on the fact that the terminated employees were entitled to a post-termination hearing . . . and the Court cautioned that the existence of post-termination procedures is relevant to the necessary scope of pre-termination procedures." *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 690 (7th Cir. 2004) (internal quotation marks omitted). Where "there is no provision for a post-termination hearing . . . the pre-termination hearing

[must] provide all the procedural safeguards to which due process entitles a tenured public employee." *Swank v. Smart*, 898 F.2d 1247, 1256 (7th Cir. 1990).

Unfortunately for Plaintiff, Gaffey failed to see the pre-termination process through. After his phone call with Bishop, he did not go to the Kewanee office the next day as planned and never returned to work. Although Gaffey assumed from his phone call with Bishop that he was being fired, he does not dispute that he was not actually fired until the Board's emergency meeting on August 26—after he failed to appear at the Kewanee office and had been absent from work for days. "Ordinarily, when an employer offers a pretermination hearing and the employee fails to accept, the *Loudermill* right to such a hearing is waived." *Ryan v. Ill. Dep't of Child. & Fam. Servs.*, 185 F.3d 751, 761 (7th Cir. 1999); *see also Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 414 (7th Cir. 1994) ("[T]he right to . . . a [pre-termination] hearing generally is waived when an employer offers a pre-termination hearing and the employee fails to accept."). Plaintiff claims that Gaffey had only been absent a short period of time before the Board met to fire him, and therefore there is at least a genuine dispute of material fact as to whether he waived his right to a hearing. But, for purposes of the qualified immunity analysis, the Court cannot find that Defendants should have known they were violating Gaffey's due process rights by moving forward with his termination after he had been out-of-contact for days. *See Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002) (explaining that to defeat qualified immunity, a plaintiff must show that the right violated was "clearly established at the time of the alleged violation, so that a reasonable public official would have known that his conduct was unlawful").

Ultimately, Plaintiff had the burden of coming forward with "a closely analogous case decided prior to the challenged conduct" to demonstrate a violation Gaffey's clearly established rights. *See id.* at 716. It is not enough for Plaintiff to point to *Loudermill* and say Gaffey was

19

denied notice and an opportunity to be heard. Rather, Plaintiff must show that under the facts here, the violation of his due process rights is beyond debate. Those facts involve a public employee whose employer learned of that employee's arrest, leading to discussions about that employee's resignation. Before those discussions could come to a resolution, the employee ceased all contact and failed to report to his job for several days, resulting in an emergency meeting at which the employee was formally terminated. Notably, Plaintiff does not cite a single case analogous to these facts. By contrast, Defendants come forward with several cases showing that it was reasonable for Defendants to conclude that Gaffey had waived any pre-termination hearing by abruptly ceasing all communication with his employer. For that reason, Defendants are entitled to qualified immunity and summary judgment in their favor.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Dkt. No. 60) is denied and Defendants' motion for summary judgment (Dkt. No. 57) is granted. The Court grants summary judgment in favor of Defendants on the federal due process claims in Counts I and II and dismisses Counts IV and V without prejudice to Plaintiff pursuing available state remedies.

ENTERED:

Dated: March 31, 2021

_____
Andrea R. Wood
United States District Judge